UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

THOMAS EDWARDS, JR.,

          Petitioner,

    -vs-

THOMAS LAVALLEY, SUPERINTENDENT
CLINTON CORRECTIONAL FACILITY

          Respondent.

_____

**DECISION AND ORDER**
**No. 11-CV-00331**

## I.   Introduction

Petitioner Thomas Edwards, Jr. ("Petitioner"), through counsel, has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered April 3, 2008, in New York State, County Court, Erie County, convicting him, upon a plea of guilty, of Criminal Possession of a Controlled Substance in the First Degree (N.Y. Penal Law ("Penal Law") § 220.21[1]) and Assault in the Third Degree (Penal Law § 120.00[2]).   Petitioner was sentenced to twelve years imprisonment and five years of post-release supervision.

## II.   Factual Background and Procedural History

### A.   Introduction

Indictment No. 02188-2006 charged Petitioner with First Degree Criminal Possession of a Controlled Substance (Penal Law

§ 220.21[1]), Second Degree Assault (Penal Law § 120.05[3]), Second Degree Obstructing Governmental Administration (Penal Law § 195.05), Resisting Arrest (Penal § 205.30), and Unlawfully Tinted Windows (Vehicle & Traffic Law § 375.12-a[b][2]). The charges arose from an incident that occurred on the evening of August 30, 2006 in Buffalo, New York, in which Petitioner was pulled over by Buffalo police for driving a vehicle with excessively tinted windows.

   **B.   Facts**

   Between 6:30 and 7:00 p.m. on August 30, 2006, Petitioner was driving his 2003 GMC Suburban Yukon in Buffalo, New York. At that time, Erie County Sheriff's Deputies Gregory McCarthy and Matthew Noecker, narcotics officers on duty in Buffalo that evening, were patrolling in an unmarked vehicle. The deputies observed Petitioner's vehicle, which had heavily tinted front driver and passenger side windows. Deputy McCarthy activated his vehicle's emergency lights and siren, and Petitioner's vehicle pulled to the curb and stopped. Record ["R."] 42-45, 156.[1] Deputy McCarthy approached the driver side of the vehicle and Deputy Noecker approached the passenger side. Petitioner lowered his driver side window and Deputy McCarthy requested Petitioner's license and

---

[1]

   In conjunction with its Response, Respondent has submitted a bound original of the record on appeal. See Resp't Ex. A. This record includes, inter alia, the transcripts of the proceedings conducted before the Erie County Court. Accordingly, the numbers following the denotation "R." refer to the pages of the record on appeal, rather than particular pages of the transcript.

registration, which Petitioner handed to him.  At the same time, Deputy McCarthy also noticed that Petitioner's "right hand was trembling . . . appeared to be trembling."  R. 47.  Deputy Noecker observed that Petitioner "appeared excessively nervous."  R. 159. Deputy McCarthy asked Petitioner where he was going, to which he responded that he was on his way to his son's football meeting and that he had his son's birth certificate inside the vehicle.  R. 47, 80.  Petitioner then asked Deputy McCarthy why he had been stopped, to which Deputy MCarthy responded that it was because of Petitioner's tinted windows.  R. 48.  Deputy McCarthy explained that he had an instrument in his vehicle that could gauge the amount of tint, and that he was going to return to his vehicle to retrieve that instrument.  Deputy McCarthy testified that he "noticed that [Petitioner's] chest was rising and falling at a rapid pace, his right leg was bouncing at a constant pace, and he appeared to [Deputy McCarthy] to be excessively nervous."  Deputy McCarthy walked back to his vehicle to retrieve the tint meter. R. 47-48.

When Deputy McCarthy returned to Petitioner's vehicle, he explained to Petitioner how the tint meter worked.  Upon testing, the windows on Petitioner's vehicle were considerably darker than permitted by law.  R. 48-49, 160.  Deputy McCarthy examined Petitioner's registration and noted that Petitioner's license and registration were listed to different addresses.  He asked

Petitioner where he lived and if he had been issued a summons recently, to which Petitioner initially replied "no" but then indicated that he had received a summons approximately three months earlier. R. 49-50.

Deputy McCarthy returned the tint meter back to his vehicle. He and Deputy Noecker conferred with each other, both agreeing that Petitioner appeared "excessively nervous." R. 51. Deputy McCarthy then returned to Petitioner's vehicle, and observed Petitioner rearranging business cards from his wallet. Deputy McCarthy observed a white substance on Petitioner's right lower palm that, based on his training and experience, had the same color, form, and consistency of crack cocaine. R. 51. Not "want[ing] to alarm [Petitioner] or get him jerky" since the vehicle was still running and Petitioner was behind the wheel, Deputy McCarthy questioned Petitioner about his criminal history, asking if Petitioner had previously been arrested for possession of cocaine or marijuana. R. 52. Petitioner denied a criminal history involving marijuana, but admitted he had previously served time in prison for cocaine possession. Deputy McCarthy then walked away from Petitioner's vehicle and again conferred with Deputy Noecker. Deputy McCarthy told Deputy Noecker "of [his] observations of [Petitioner's] hands." The deputies agreed they would "get [Petitioner] out of the car." R. 53, 163.

The deputies returned to Petitioner's vehicle a fourth and final time and told Petitioner to get out of his vehicle. R. 54, 164. Petitioner asked if he was under arrest, to which Deputy McCarthy responded that Petitioner was not and that he wished to speak with Petitioner about his license. R. 54, 164-165. Petitioner refused to leave his vehicle and rolled up his window, which prevented the deputies to see him. R. 54, 166. Deputy McCarthy pulled on the door, which was unlocked, and Petitioner started to exit the vehicle. R. 56. Petitioner turned the engine off, removed the keys from the ignition, and locked the doors using the remote door lock on the ignition key. R. 56, 166. Deputy McCarthy testified that "it looked like [Petitioner] was going to throw the keys." R. 56-56a. Deputy McCarthy asked Petitioner to proceed to the back of the vehicle and asked Petitioner for his keys. Petitioner refused. R. 56a. Fearing the keys could be used as a weapon, the deputies asked Petitioner again for the keys. R. 57, 167. When Petitioner refused to surrender the keys, the deputies attempted to physically remove them from Petitioner's "grip." R. 57, 167. In doing so, the deputies braced Petitioner against the vehicle in an attempt to place handcuffs on him. A struggle ensued. Deputy McCarthy told Petitioner that he was under arrest and repeatedly ordered him to put his hands behind his back. The three men fell to the ground a number of times during the struggle. R. 58, 167-168. In the course of the struggle, Deputy

McCarthy felt a "popping crunch in [his] left breast area." R. 59, 169.

Eventually, Deputy Noecker managed to place handcuffs on Petitioner. Deputy McCarthy searched Petitioner, removing approximately $823 in cash "and a lot of crack cocaine crumbs." R. 60, 169. Shortly thereafter, Detective Charlie Tirone arrived at the scene and drove Deputy McCarthy to the hospital. R. 61-62, 121. Petitioner's vehicle was impounded and cocaine was found inside of it.[2] R. 170, 175, 187-188.

### C. The Suppression Hearing Decision

Petitioner moved to suppress the physical evidence seized from his vehicle and his person. On July 19 and October 4, 2007, a hearing was conducted in the Erie County Court before the Hon. Sheila DiTullio, at which Deputies McCarthy and Noecker testified. On January 7, 2008, the court handed down its decision, crediting the testimony of Deputies McCarthy and Noecker and determining that the stop of Petitioner's vehicle, his arrest, and subsequent searches of Petitioner and his vehicle were lawful. The court denied Petitioner's motion to suppress. R. 189-195.

### D. The Guilty Plea

On January 10, 2008, Petitioner appeared in Erie County Court before the Hon. DiTullio and entered a plea of guilty to one count

---

[2]
A ticket for the tinted windows was not issued until after Petitioner's vehicle was searched. R. 175.

of Criminal Possession of a Controlled Substance in the First Degree and one count of Assault in the Third Degree. Petitioner reserved his right to appeal. The court agreed to impose the minimum possible sentence of twelve years imprisonment with a period of five years post-release supervision. R. 199-204.

### E.    The Motion to Re-Open the Suppression Hearing

On or about March 21, 2008, Petitioner moved, *pro se*, to re-open the suppression hearing and sought reconsideration of the court's decision, arguing that he had been denied his constitutional right to testify on his own behalf at the suppression hearing and that he had been denied his constitutional right to offer expert testimony in his defense at the suppression hearing. R. 206-226. After conducting oral arguments, the court denied Petitioner's motion. R. 264-272, 278-281.

### F.    Sentencing

On April 3, 2008, Petitioner was sentenced, as agreed, to twelve years imprisonment followed by a five year period of post-release supervision. R. 285.

### G.    Direct Appeal

Petitioner appealed his judgment of conviction to the Appellate Division, Fourth Department on the following grounds: (1) the court should reverse the order denying Petitioner's suppression motion because Petitioner's detention, pursuant to a pre-textual traffic stop for tinted windows, was deliberately

extended through multiple trips to and from Petitioner's vehicle by officers hoping to develop a speculative narcotics investigation; (2) Petitioner was entitled to use reasonable force to resist an unlawful arrest; and (3) the lower court abused its discretion in denying Petitioner's motion to re-open the suppression hearing. See Pet'r Br. on Appeal, Points I-III at Resp't Ex. B. On August 28, 2009, the Appellate Division, Fourth Department reversed the judgment of conviction, granted suppression, and dismissed the indictment. People v. Edwards, 65 A.D.3d 829 (4th Dep't 2009) (Justices Scudder, P.J., and Peradotto, J., dissenting). Respondent applied for leave to appeal to the New York Court of Appeals, which was granted on October 21, 2009. See Resp't Ex. C. On February 16, 2010, the New York Court of Appeals unanimously reversed the Appellate Division and reinstated the judgment of conviction. People v. Edwards, 14 N.Y.3d 741 (2010). Petitioner's request for re-argument was denied on March 30, 2010. People v. Edwards, 14 N.Y.3d 794 (2010).

**F.  The Habeas Corpus Petition**

This habeas corpus petition followed, wherein Petitioner seeks habeas relief on the following grounds: (1) the New York Court of Appeals lacked jurisdiction to entertain Respondent's appeal; and (2) Petitioner's conviction was obtained by use of evidence gained pursuant to an unconstitutional arrest, search, and seizure. See Pet., Grounds One-Three (Dkt. No. 1); Reply (Dkt. No. 14).

Petitioner also requests that a writ of habeas corpus be issued, or, alternatively, that an evidentiary hearing, pursuant to 28 U.S.C. § 2254(e), be ordered.  See Reply at 8, 39-47.  "A district court has broad discretion to hear further evidence in habeas cases." Nieblas v. Smith, 204 F.3d 29, 31 (2d Cir. 1999) (citing Townsend v. Sain, 372 U.S. 293, 318 (1963)). "[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (quoting Harris v. Nelson, 394 U.S. 286, 300, 89 S. Ct. 1082, 22 L. Ed.2d 281 (1969)); see also Schriro v. Landrigan, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").  As discussed below, it is abundantly clear from the record before this Court that Petitioner's claims have no merit and that there are no grounds for habeas relief.  Accordingly, Petitioner's request for an evidentiary hearing and habeas relief is denied and the petition is dismissed.

## II.   The AEDPA Standard of Review

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(1)-(2).

## III. Analysis of the Petition

## 1.   Ground One of the Petition is Not Cognizable

In ground one of the petition, Petitioner argues "that the decision and order of the New York State Court of Appeals . . . which purported to reverse the decision and order of the state appellate division . . . is null and void and of no effect . . . ." Reply at 3.[3]   In support of his argument, Petitioner states that the Appellate Division's decision reversing Petitioner's conviction involved a mixed question of law and fact and was therefore outside the jurisdictional limit of the New York Court of Appeals insofar as said court is jurisdictionally limited, pursuant to the New York

---

[3]
The pages of Petitioner's Reply are misnumbered.  Accordingly, the numbers following "Reply" refer to the CM/ECF pagination.

State constitution, to reviewing questions of law. See Pet., Ground One; Reply at 1-9. As discussed below, this claim provides no basis for habeas relief.

28 U.S.C. § 2254(a) permits federal habeas corpus review only where the petitioner has alleged that he is in custody in violation of the Constitution or law and treaties of the United States. See generally, Estelle v. McGuire, 502 U.S. 62, 68(1991) (A federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Although Petitioner has creatively cast this claim in broad constitutional terms arguing that the decision of the New York Court of Appeals to entertain the People's appeal effectively "worked to deprive [him] of his State and Federal constitutional right to due process and equal protection under the law," the basis of the claim is an alleged violation of the New York State constitution, namely § 3 of article VI of the New York State constitution. See Pet., Ground One; Reply at 2. As such, this claim presents no federal constitutional issue and is therefore not cognizable by this Court on federal habeas review. The claim is dismissed.

## 2.   Grounds Two and Three are Meritless

In grounds two and three of the petition, Petitioner contends that his conviction was obtained by use of evidence gained pursuant to an unconstitutional arrest, search and seizure. Further, he

argues that there was an "unconscionable" breakdown in the litigation of his Fourth Amendment claim in the state courts. See Pet., Grounds Two-Three; Reply at 9-46. The New York Court of Appeals rejected Petitioner's Fourth Amendment claim on the merits and, as such, the AEDPA applies. Under that standard, Petitioner's claim is meritless.

In Stone v. Powell, 428 U.S. 465 (1976), the Supreme Court established that, "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 494; see also Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992). Thus, a federal court "ha[s] no authority to review the state record and grant the writ simply because [it] disagree[s] with the result reached by the state courts" on a Fourth Amendment issue. Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977); see also Torres v. Irvin, 33 F. Supp. 2d 257, 264 (S.D.N.Y. 1998) (stating that "[a] petition for a writ of habeas corpus must be dismissed where it seeks simply to relitigate a Fourth Amendment claim"). Indeed, a federal court may only review such a claim where "the state has provided no corrective procedures at all" or where the state has provided a corrective mechanism, but the defendant is precluded from using that mechanism "because of an unconscionable breakdown in the

underlying process." <u>Capellan</u>, 975 F.2d at 70 (citing <u>Gates</u>, 568 F.2d at 840); <u>Torres</u>, 33 F. Supp. 2d at 264 ("[A] disruption or obstruction of a state proceeding" or an instance of serious judicial or prosecutorial misconduct may constitute such a breakdown in process); <u>see</u> <u>also</u> <u>Cappiello v. Hoke</u>, 698 F. Supp. 1042, 1050 (E.D.N.Y. 1988) (explaining that an "unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society," such as the bribing of a state court judge, the government's knowing use of perjured testimony, and the use of torture to extract a guilty plea), <u>aff'd</u>, 852 F.2d 59 (2d Cir. 1988) (per curiam).

Here, Petitioner does not dispute that he had the opportunity to litigate his Fourth Amendment claim in the state courts. Indeed, the record reflects that Petitioner extensively litigated his claim at all levels of the state court proceedings: at the trial phase (via the suppression hearing and subsequent motion to re-open the suppression hearing); on direct appeal (at which he prevailed); and before the New York Court of Appeals (via his opposition to Respondent's leave application and in his submission pursuant to Rule 500.11 addressing the basis of the Appellate Division's reversal). <u>See</u> Resp't Exs. A-D. Petitioner argues, however, "that an 'unconscionable breakdown' occurred in the trial

and appellate courts' litigation of his Fourth Amendment claim, in that: (i) [t]he suppression court's denial of Petitioner's motion to re-open the pre-trial suppression hearing . . . was an abuse of discretion of constitutional error in that the ruling was without legitimate basis, and rendered the fact-finding procedure employed by the state court inadequate to afford Petitioner a full and fair hearing on the Fourth Amendment claim; (ii) the Court of Appeals' factual determinations are so blatantly erroneous so as to constitute 'egregious errors' in its fact finding determination relevant to Petitioner's Fourth Amendment claim . . ., and ; (iii) as a matter of law, the police officers did not inordinately prolong the detention beyond what was reasonable under the circumstances to address the traffic infraction." Pet. at 17-18. Yet, "the focus of the inquiry as to whether there has been an 'unconscionable breakdown' in the state corrective process is on 'the existence and application of the corrective procedures themselves' rather than on the 'outcome resulting from the application of adequate state court corrective procedures.'" Singh v. Miller, 104 F. App'x 770, 772 (2d Cir. 2004) (quoting Capellan, 975 F.2d at 71).

The record clearly reveals that Petitioner was afforded a suppression hearing during which the instant claims were litigated at length. He then moved to re-open the suppression hearing and, after oral arguments were conducted, that request was denied.

Petitioner then raised the claim on direct appeal and succeeded in having his conviction reversed.   He was then afforded the opportunity to oppose the People's leave application, as well as an opportunity to address the basis of the Appellate Division's reversal.   Moreover, based on a review of the proceedings before the state courts, it is clear that the state courts conducted "a reasoned method of inquiry into relevant questions of fact and law."   Capellan, 975 F.2d at 71 (citation omitted).

Accordingly, Petitioner has not demonstrated that the state failed to provide a corrective procedure or that an "unconscionable breakdown" occurred in that corrective process.   Accordingly, his Fourth Amendment claim is not reviewable by this Court and the claim is dismissed.

## V.   Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed.   Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.   See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).   The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and

therefore denies leave to appeal as a poor person.  <u>Coppedge v.</u> <u>United States</u>, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     May 9, 2012
           Rochester, New York